**MTN**
THOMAS CHRISTENSEN, ESQ.
Nevada Bar No. 2326
DAVID F. SAMPSON, ESQ.
Nevada Bar No. 6811
CHRISTENSEN LAW OFFICES, LLC
1000 S. Valley View Blvd.
Las Vegas, Nevada 89107
Attorney for Plaintiff,

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| ERENDIRA ESPERANZA GUZMAN-IBARGUEN, individually; ERENDIRA MEJIA-GUZMAN, individually; MARIA FERNANDEZ MEJIA-GUZMAN, individually; TAMMY HARLESS as Special Administrator for the Estate of OSCAR ANICETO MEJIA-ESTRADA<br>Plaintiffs,<br>v.<br><br>SUNRISE HOSPITAL AND MEDICAL CENTER, LLC.; OSCAR CHAVES, RN; NANCY BEASLEY RN; ARLAMAY ROGERS, RN; LAUREN HENDRICKS, RN; MARCELINO A. TACADENA, RN; TINA HAYES, CNA; NURSE STRUASS RN; TIEN CHANG WANG, MD; ANTHONY KEILY; JEFFREY JOHNSTON; SOUTHWEST EMERGENCY ASSOCIATES; FREMONT EMERGENCY DOES I-XX and ROES I-X,<br>Defendants, | Case No. 2:10cv-01228-PMP-PAL |

### MOTION TO COMPEL ANSWERS TO INTERROGATORIES AND REQUESTS FOR PRODUCTION

COMES NOW, Plaintiffs, by and through their attorneys, CHRISTENSEN LAW OFFICES, LLC, and hereby moves this Honorable Court for the relief requested herein.

1

This Motion is based on the Points and Authorities set forth below, the papers and pleadings on file herein, and such oral argument as may be heard at the time of the hearing of this matter. An Certification of Compliance with FRCP 26(c)(1) is attached at the end of this document and is also attached hereto as Exhibit "1".

### Introduction

The facts of this matter are detailed in the Affidavit of Paul K. Bronston, M.D., which is attached hereto as Exhibit "2" and which is incorporated herein by this reference. Oscar underwent an initial period of hospitalization at Sunrise Hospital on July 25, 2008 for concerns that he was suicidal. After spending 1 hour and 2 minutes at Sunrise, Oscar Mejia was discharged from care. Exhibit "2" paragraph 13; Complaint paragraph 20. At 12:04 A.M. on July 27, 2008 Oscar arrived back at Sunrise Hospital due to renewed concerns about his depression. Exhibit "2" paragraph 15, Complaint paragraph 22.

A note from the doctor who initially examined Oscar at Sunrise indicated that Oscar presented with a chief complaint of being "Delusional and Paranoid". Exhibit "2" paragraph 31, Amended Complaint paragraph 34(e). The report indicated Oscar had been angry and had mood swings and insomnia. The report also stated "The patient exhibits altered thought processes. Appears to have persecution delusions", as well as saying "The family was counseled in person regarding the patient's diagnosis *and the need for admission*." Exhibit "2" paragraph 32, Amended Complaint Paragraph 34(f) (Emphasis added).

A note from Dr. Wang at Sunrise, generated at 2:30 A.M. stated the Oscar "needed to be admitted to a hospital for appropriate medical care." The note further stated "I have personally observed and examined this allegedly mentally ill person and have concluded

that, as a result of mental illness, this person is likely to harm self or to others (sic). My opinions and conclusions are based on the following fact and reasons: **Patient is acutely psychotic**." Exhibit "2" paragraph 32, Amended Complaint paragraph 34(f) (Emphasis added). The required EMTALA Memorandum of Transfer was placed in Oscar's chart, but was not completed. *Id.*

Per doctors' orders, Oscar was to be checked every 15 minutes for suicide precautions. Exhibit "2" paragraph 23, Complaint paragraph 30. Oscar's situation was so emergent, and the threat that he would harm himself was so great, that Oscar's clothing and valuables were taken from him and given to security. Exhibit "2" paragraph 23, Complaint paragraph 30. Despite the clear records indicating Oscar was a threat to himself and to others, and despite specific orders to admit Oscar and to perform suicide checks on him every 15 minutes, the records indicate Oscar was never admitted to the hospital, and was only seen once every one to three hours. Exhibit "2" paragraphs 16-27, Complaint paragraphs 23-34.

At 9:10 A.M., almost nine hours after Oscar first presented to Sunrise, and almost seven hours after doctors at Sunrise had recorded Oscar's "need for admission", Oscar had still not been admitted. At this time Oscar's vital signs were taken and the notation is again made that Oscar had flight ideas and was confused and "delusional", and "did not want to contaminate the world." Exhibit "2" paragraph 25, Complaint paragraph 32. There are no records of Oscar being seen for over three hours after this 9:10 A.M. entry. Exhibit "2" paragraph 33, Complaint paragraph 26.

Twelve hours after Oscar was admitted, and ten hours seven hours after doctors at Sunrise had recorded Oscar's "need for admission", Oscar had still not been admitted.

3

While the records are conflicting, what is known is that at 12:45 P.M. Oscar was found face down in his bed. It was determined he had killed himself by stuffing two socks down his own throat. Exhibit "2" paragraph 27, Complaint paragraph 34. As Dr. Bronston's Affidavit notes, from, at the very latest, 2:30 A.M., "it is clear Mr. Mejia had a psychiatric emergency medical condition and was unstable and the standard of care and Federal EMTALA statute required that this patient be stabilized. Stabilization would have required per EMTALA and the standard of care that such care be rendered as to prevent the material deterioration of this patient. Without constant monitoring of this patient or by chemically or physically restraining the patient, Mr. Mejia was NOT stabilized as required." Exhibit "2" paragraph 32, AMENDED Complaint paragraph 34(f). Oscar died 12 hours after presenting to Sunrise, ten hours after instructions to admit the patient had been given. Oscar died without ever being admitted, without ever being stabilized, and without receiving the care EMTALA requires.

On October 19, 2010 the Nevada Department of Health and Human Services ("NV DHHS") issued a decision, in letter form, to Sunrise regarding this matter. *See* Exhibit "3". In the letter NV DHHS states:

Your hospital was surveyed on August 6, 2010, by the Nevada Department of Health and Human Services (NV DHHS), based on an allegation of noncompliance with the requirements of 42 CFR. The requirements violated were:

| | | |
|---|---|---|
| 2400 | §489.20(1) | Compliance with the policy and procedures of 42 §489.24 |
| 2406 | §489.24(a) | Failure to provide appropriate Medical Screening Examination |

*See* Exhibit "3".

The letter continued to lay out the fact that NV DHHS determined that Defendants' EMTALA committed violations, noting "The deficiencies identified are listed on the

enclosed CMS-2567". In the letter, NV DHHS stated "we plan to terminate Sunrise Hospital And Medical Center participation in the Medicare program. Sunrise ability to participate in the Medicare program would terminate January 17, 2011. *See* Exhibit "3". Sunrise was invited to provide credible evidence of correction of the deficiencies or to prove that the deficiencies in fact did not exist. *See* Exhibit "3".

In response to the letter from NV DHHS, Sunrise did not prove, or even attempt to prove, that the deficiencies did not exist, and instead provided a "Plan of Correction". *See* Exhibit "4". In the plan of correction Sunrise admitted its EMTALA violations and advised NV DHHS as to steps Sunrise had taken to correct the violations. Sunrise plan states:

> The concerns of CMS have been taken very seriously by the Hospital Administration, the Medical Executive Committee of the Medical Staff, and the Board of Trustees. You can be assured that the highest priority has been assigned to **correcting and clarifying** policies and procedures relating to the:
>
> 2400 §489.20(1) Compliance with the policy and procedures of 42 §489.24
> 2406 §489.24(a) Failure to provide appropriate Medical Screening Examination.

See Exhibit "4" P. 2 (emphasis added).

Sunrise Plan of Correction also stated "The actions taken to **correct** the deficiencies include review and revisions, when appropriate, to the procedures relating to EMTALA regulations, Medical Screening Examinations patient monitoring." *See* Exhibit "4" P. 2. The Plan also states "Additional resources have been provided to staff and physicians to facilitate compliance." *Id.* Sunrise's Plan never proffers any proof that deficiencies did not exist, and instead simply indicates that "there is credible evidence of compliance with Medicare requirements". *Id.*

The remainder of Sunrise's Plan details the violations and sets forth steps Sunrise took *after* Oscar Mejia's death to remedy the EMTALA violations Sunrise admits it committed. *See generally*, Exhibit "4". This includes entering into a professional services agreement on August 14, 2008 (over two weeks after Oscar's death); more specific and stratified observation techniques were implemented in September 2009 to document and ensure safety checks are in fact performed; shift meetings held in August 2009 to educate staff about assessment checks and documentation; in service program implemented on October 22, 2010 regarding suicide prevention; audits held in September and December 2009; review of EMTALA procedures in April 2010; and so forth.

### Facts

Plaintiff has submitted discovery to Defendant Sunrise in this matter. The following responses from Sunrise responses were provided to the Plaintiff as outlined below:

Answers to Plaintiff Erendira Mejia's-Guzman's First set of Request for Production (Exhibit "5").

Answers to Plaintiff Erendira Mejia's-Guzman's First set of Interrogatories (Exhibit "6")

Answers to Plaintiff Erendira Eseranza Guzman-Ibarguen's First set of Interrogatories (Exhibit "7").

The responses given were remarkably insufficient. Answers to Plaintiff Erendira Mejia's-Guzman's First set of Request for Production (Exhibit "5") referenced requests for: documents pertaining to the treatment of Oscar Mejia (Request No. 1); witness statements (Request No. 2); documents supporting or supporting or refuting the allegations of the complaint or answer (Request No. 4); the pre-litigation claims file (Request No. 7); internal

review records (Request Nos. 15 and 16); other reports generated by the Proactive Patient Safety and Quality Care Committee (Request No. 22); and investigation reports concerning malpractice or EMTALA complaints in the last 5 years (Request No. 32). Defendant's response to these requests was to object to the same and claim that the documents were protected by the "Peer Review Safety and Quality Assurance Committees Privilege pursuant to Nevada Revised Statute 49.117, 49.119, 49.265, 439.860, and 439.875." Defendant also objected and claimed the "Request as drafted seeks attorney-client and work product privileged information." Defendant also objected that the requests were "overly broad and ambiguous as to time and scope."

Interrogatory No. 1 of Plaintiff Erendira Mejia's-Guzman's First set of Interrogatories asked Defendant to state all facts which support Defendant's position that no material deterioration of Oscar Mejia's condition was likely. Defendant's answer was to object and claim the interrogatory was vague as to time and place, and requested a medical opinion. See Exhibit "6".

Interrogatory No. 4 of Plaintiff Erendira Mejia's-Guzman's First set of Interrogatories asked Defendant to state what clothing, if any, Oscar Mejia was wearing at any point in time on July 27, 2008, including the time Oscar was wearing any of the said clothing. Defendant's answer was to object and claim the interrogatory was vague and ambiguous as to time and "clothing". See Exhibit "6".

Interrogatory No. 5 of Plaintiff Erendira Mejia's-Guzman's First set of Interrogatories asked Defendant to state all facts indicating how Oscar Mejia came in to possession of the socks found lodged in his throat on July 27, 2008. Defendant's answer

was "It is the understanding and belief of Sunrise Hospital that Oscar Mejia requested the socks for warmth. See Exhibit "6".

Answers to Plaintiff Erendira Esperanza Guzman-Ibarguen's First set of Request for Production (Exhibit "7") referenced requests for: fundamental corporate information about Sunrise (Interrogatory No. 2); licenses possessed by Sunrise (Interrogatory No. 4); prior malpractice claims against Sunrise (Interrogatory No. 5); other EMTALA claims (Interrogatory Nos. 6 - 8); the details of any hearings related to the incident set forth in the Complaint (Interrogatory No. 9); the names of doctors with whom Oscar's case was discussed (Interrogatory No. 11); identification of statements of witnesses (Interrogatory No. 14); and a description of what happened to Oscar at Sunrise (Interrogatory Nos. 18 and 19). Sunrise's response for almost all of the above was to refuse to provide information by claiming the information is "public domain and equally accessible to the Plaintiffs". Defendant also claimed it was not required to answer based on the "Peer Review Safety and Quality Assurance Committees Privilege pursuant to Nevada Revised Statute 49.117, 49.119, 49.265, 439.860, and 439.875." Defendant also at times simply referred the Plaintiff to the medical records. See Exhibit "7".

## Argument

The Federal Rules of Civil Procedure specifically authorize a party to submit interrogatories and requests for production to litigants. The interrogatories and requests for production propounded by the Plaintiffs in this matter are proper and request information routinely requested in interrogatories to parties in similar matters. Defendant's improper attempt to delay answering the interrogatories is frustrating Plaintiffs' attempt to conduct discovery and establish their claims.

## PEER REVIEW PRIVILEGE

Defendant points the Plaintiffs to the Peer Review Safety and Quality Assurance Committees Privilege pursuant to Nevada Revised Statute 49.117, 49.119, 49.265, 439.860, and 439.875. The said statutes are state statutes which do not govern in a Federal EMTALA action. This was the exact issue addressed by the Court in *Agster v. Maricopa County*, 422 F.3d 836, 840 (9th Cir. 2005). In *Agster*, the plaintiffs sought discovery of an internal review of the death of a prison inmate. The request for the information was opposed by the Defendant, who pointed to Arizona law requiring its confidentiality. The district court ruled "that no federal peer review privilege has been adopted in the Ninth Circuit." *Id*. The Ninth Circuit Court affirmed, noting "Arizona recognizes the privilege attached to peer review of 'the professional practices within the hospital or center for the purposes of reducing morbidity and mortality and for the improvement of the care of patients provided in the institution.' Ariz.Rev.Stat. §§ 36-445, 36-445.01. But we are not bound by Arizona law". *Id*. The Court emphatically noted that "No case in this circuit has recognized the privilege."

In so ruling, the Court stated:

> We must be "especially reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself." *Univ. of Pennsylvania v. EEOC*, 493 U.S. 182, 189, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990). The Health Care Quality Improvement Act of 1986 granted immunity to participants in medical peer reviews, but did not privilege the report resulting from the process. *See* 42 U.S.C. §§ 11101-11152. Congress amended the act in 1987 to state that "nothing in this subchapter shall be construed as changing the liabilities or immunities under law or as preempting or overriding any State law." Pub.L. No. 100-177, § 402(c). As Congress has twice had occasion and opportunity to consider the privilege and not granted it either explicitly or by implication, there exists a general objection to our doing so.

*Id.*

The Court also recognized that where, as here, a case involved a state claim (medical malpractice) together with an action under federal law, (EMTALA) the privilege

9

does not apply, recognizing, "Where there are federal question claims and pendent state law claims present, the federal law of privilege applies." *Id.* (citing Fed.R.Evid. 501 advisory committee note; *see also* *840 *Wm. T. Thompson Co. v. Gen. Nutrition Corp.*, 671 F.2d 100, 104 (3d Cir.1982)).

Sunrise's attempt to hide documents from the Plaintiffs in this action, and refuse to answer questions related to Oscar's death and any investigation of the same, based on a state peer review privilege are not well founded. As Sunrise refuses to provide the information under standard discovery methods, an order compelling the information is warranted.

**ATTORNEY-CLIENT PRIVILEGE**

The information requested came to be long before any lawsuit was filed against Sunrise. Indeed, when this action was first filed Sunrise filed a motion for Summary Judgment claiming there was no evidence that an EMTALA violation occurred. Thus Sunrise could not have anticipated the instant litigation. As such the information is not subject to an attorney-client privilege. Further, discussions between doctors, who are not attorneys, cannot fall under the attorney-client privilege. Finally, Sunrise did not provide a privilege log detailing the peer review records.

**BREADTH AND SCOPE**

Objections that the discovery is ambiguous as to time and scope are not well founded. The interrogatories specifically reference Oscar Mejia, as well as the date of July 27, 2008. The objection is spurious. The information needs to be provided.

## SPECIFIC INTERROGATORY OBJECTIONS

Interrogatory No. 1 of Plaintiff Erendira Mejia's-Guzman's First set of Interrogatories asked Defendant to state all facts which support Defendant's position that no material deterioration of Oscar Mejia's condition was likely. Defendant's answer was to object and claim the interrogatory was vague as to time and place, and requested a medical opinion. See Exhibit "6".

Again, Mr. Mejia was not at Sunrise for months on end. Sunrise can easily answer the interrogatory regarding any position it took that a material deterioration in Oscar's condition was unlikely at any point in time.

Interrogatory No. 4 of Plaintiff Erendira Mejia's-Guzman's First set of Interrogatories asked Defendant to state what clothing, if any, Oscar Mejia was wearing at any point in time on July 27, 2008, including the time Oscar was wearing any of the said clothing. Defendant's answer was to object and claim the interrogatory was vague and ambiguous as to time and "clothing". See Exhibit "6".

The very notion that "clothing" is ambiguous is laughable. Clearly the interrogatory is unambiguous as to time as it is specifically limited to "any point in time on July 27, 2008. Sunrise needs to answer as to what clothing, if any, Oscar was wearing at any time on July 27, 2008.

Interrogatory No. 5 of Plaintiff Erendira Mejia's-Guzman's First set of Interrogatories asked Defendant to state all facts indicating how Oscar Mejia came in to possession of the socks found lodged in his throat on July 27, 2008. Defendant's answer was "It is the understanding and belief of Sunrise Hospital that Oscar Mejia requested the socks for warmth. See Exhibit "6".

11

While Defendant's answer attempts to explain the reason why Oscar may have ended up with socks, it does not explain how Oscar came into possession of the socks. Surely the socks did not appear out of thin air just because Oscar requested them for warmth. Plaintiffs have the right to learn how Oscar ended up having socks at all. The interrogatory needs to be answered

### Conclusion

Based upon the foregoing, Plaintiff respectfully seeks an order compelling the discovery responded referenced herein.

DATED this 28 day of March, 2011.

CHRISTENSEN LAW OFFICES, LLC

BY:_____
THOMAS CHRISTENSEN, ESQ.
Nevada Bar No. 2326
DAVID F. SAMPSON, ESQ.
Nevada Bar No. 6811
1000 S. Valley View
Las Vegas, Nevada 89107
Attorneys for Plaintiffs

## CERTIFICATE IN COMPLIANCE WITH FRCP 26(c)(1)

Plaintiffs hereby submit this certification that they have, through counsel, conferred in good faith with CSE in an effort to resolve this discovery dispute without court action pursuant to FRCP 26(c)(1).

I, David Sampson, Esq., hereby certify that I am the attorney of record in the above-entitled action, and that I conferred in good faith with attorney Jonquil Urdaz, Esq., who represents Sunrise in this matter. We discussed, on several occasions, the fact that Sunrise cannot rely on a state peer review privilege in a federal action. We also discussed how Defendant's objections to Plaintiffs' interrogatories are unfounded as the questions are limited in time and scope, and are not ambiguous. Sunrise refuses to provide any further answers or information beyond what has already been set forth. I certify that I have conferred in good faith with Sunrise's counsel in an effort to resolve this dispute without court action, and that my efforts have not resolved this matter and that court action is currently warranted.

Dated this 28th day of March, 2011

_____
DAVID F. SAMPSON, ESQ.

SUBSCRIBED AND SWORN to before me this 28th day of March, 2011.

_Sandra Duritza_
NOTARY PUBLIC in and for CLARK COUNTY
STATE OF NEVADA

SANDRA DURITZA-GONZALES
Notary Public State of Nevada
No. 02-78670-1
My appt. exp. Oct. 22, 2014